JUDGE HOLWELL



07 CIV 6058

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
JESUS MENDEZ,
                Plaintiff,

      - against -

OPPENHEIMERFUNDS, INC. AND KEITH
SPENCER, INDIVIDUALLY, AND IN HIS OFFICIAL
CAPACITY AS AN EMPLOYEE OF
OPPENHEIMERFUNDS, INC.

                Defendants.
------------------------------------X

Case No.:

**COMPLAINT AND JURY DEMAND**

      COMES NOW Plaintiff, Jesus Mendez ("**Mendez**"), by and through his undersigned counsel, The Law Offices of Neal Brickman P.C., located at 317 Madison Avenue, 21st Floor, New York, New York, 10017, and as and for his complaint against Defendant, Oppenheimer Funds, Inc. ("**Oppenheimer**") and Keith Spencer ("**Spencer**"), states and alleges as follows:

### NATURE OF THE ACTION

    1.    This is an action alleging national origin discrimination, as well as retaliation, under New York Executive Law § 296 and New York Administrative Law §§ 8-107, 8-503. Mendez, the only Latino[1] assigned to Oppenheimer's Global Trading desk, alleges that, as a direct result of his status as a Latino, he became the target of management's directives to terminate him. Specifically, Mendez claims that, as a direct result of his race and/or national origin, he suffered adverse employment decisions including, but not limited to, being passed up

---

[1] Due to some uncertainty in the case law as to whether one's status as an "Hispanic" or "Latino" (used herein interchangeably) is better characterized as a race or a national origin," *Alonzo v. Chase Manhattan Bank, N.A.*, 25 F.Supp.2d 455, 460 (S.D.N.Y.1998) (cited by *Deravin v. Kerik*, 335 F.3d 195, 202 (2d Cir.2003)), Plaintiff broadly invokes the provisions of the Human Rights statutes and pleads race/national origin discrimination in the alternative.

for promotion in favor of objectively less-qualified white, non-Hispanic employees, as well as harassment and intimidation by white co-workers.

2. Thereafter, immediately following Mendez's complaints to HR about the discriminatory and harassing treatment he was experiencing, Mendez was pulled off of the trading desk, demoted to a non-existent position with no discernable duties or responsibilities, subjected to false negative performance reviews and, ultimately, terminated on or about February 15, 2007. Mendez seeks compensatory and punitive damages, the costs and disbursements related to this action, interest, and attorneys' fees for these violations.

## JURISDICTION AND VENUE

3. This Court has diversity jurisdiction over this matter, pursuant to 28 U.S.C. § 1332, because the parties are citizens of different states for purposes of diversity jurisdiction under 28 U.S.C. § 1332(c), and because the amount in controversy, exclusive of fees and costs, exceeds the sum of $75,000.00.

4. Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1391 because the defendant entity resides, for purposes of venue pursuant to 28 U.S.C. § 1391(c), in this judicial district and because a substantial part of the events giving rise to the claims herein occurred in this judicial district.

## PARTIES

5. Plaintiff Jesus Mendez is an individual residing at 12 Hillcrest Court, Old Tappan, New Jersey 07675.

6. Defendant Oppenheimer was and is a Colorado Corporation, duly authorized to conduct business in the State of New York, subject to the laws and statutes thereof, and

maintaining its principal place of business at 2 World Financial Center, 225 Liberty Street, 11th Floor, New York, New York 10281.

7. Upon information and belief, Keith Spencer is, and was, at all times relevant hereto, a resident of the State of New York. Spencer qualifies as an "employer" for purposes of individual liability under New York Executive Law § 296, and New York City Administrative Code §§ 8-107 and 8-502 because he could control the terms and conditions of Plaintiff's employment, including, but not limited to, his compensation, his work schedule, his employment records, his compensation and was possessed of the ability to hire and fire Plaintiff. Alternatively, as set forth in detail below, Spencer qualifies as an "employer" under § 296(6) of the Executive Law by virtue of his oversight and/or participation in the discriminatory and retaliatory acts alleged.

## FACTUAL BACKGROUND

8. In or around June of 2000, Mendez was hired by Oppenheimer as a Global Trader. Mendez, who holds an MBA and had approximately 8 years of experience in the industry at the time of his hire, was fully qualified for the position in all respects.

9. Mendez, like all of Oppenheimer's traders, was evaluated based on objective trading data using the Plexus BrokerEdge computer program ("**Plexus**"). According to the empirical Plexus data, Mendez, at all times relevant hereto, performed his duties exceptionally well.

10. Almost immediately, however, Mendez discovered that he was excluded, both in terms of social dynamics and work function, from his non-hispanic co-workers. Specifically, John Boydell ("**Boydell**"), a junior trader with absolutely no experience whatsoever, hired in or

around June of 2000, had developed a close relationship with Mendez' supervisor, Keith Spencer ("**Spencer**").

11.  Spencer asked Mendez, whom he called a "heavy hitter," to train Boydell. Mendez in fact spent several months training Boydell while fulfilling his other day-to-day duties. However, once the training was complete, Mendez was left alone at the trading desk for approximately 50% of the workday, while Boydell (whose job it was to be at the trading desk), would simply place orders and leave Mendez with the task of "watching the blotters," while he socialized with Spencer.

12.  Despite hid 'do-nothing' work ethic at the trading desk, Boydell was promoted to positions of increased pay and responsibility, while Mendez was not compensated in a manner consistent with Boydell or other, similarly situated, white, non-hispanic employees.

13.  In or around June of 2002, Spencer and Boydell arranged for all fund managers and brokers at Oppenheimer to attend a party, which Mendez attended.

14.  The party itself was indicative of the company's overall "good old boy" culture of segregation and discrimination.  As usual, Spencer, Boydell and the other white employees moved in their own circle, excluding Mendez, despite the fact that they were supposed to be on the same team.

15.  During the occasional off moment, when Spencer and Boydell were not directing and arranging the prostitutes and midgets that had been hired as entertainment to perform sex acts on one another as a form of amusement, Spencer was making decisions about the terms and conditions of Mendez's employment.

16.  In this carnival-like atmosphere, Spencer announced that he was about to accede

to the position of Head trader and that he, in turn, would promote Boydell to Mendez's position. Distraught, Mendez pulled Spencer aside, asking him, "what about me?"

17. Spencer answered that he could not take care of everybody, and that he wanted to promote Boydell.

18. Mendez, a qualified, experienced trader with an exemplary Plexus track record, in addition to his MBA qualification, could not understand why Boydell, an objectively-less qualified and relatively inexperienced trader, was taking his job.

19. Thereafter, Mendez began to openly question Spencer as to his continued prospects at Oppenheimer, as well as what position Mendez would hold after Boydell's promotion. Spencer would not answer and, when pressed, would only reply that he could not take care of everybody.

20. In or around November of 2002, Spencer hired another white trader, Jared O'Connell ("**O'Connell**"), the son of Oppenheimer's parent company's Chief Executive Officer. Apart from his family connections, O'Connell had no experience or training in the industry whatsoever, and was hired right out of college.

21. Mendez, whose talents and abilities as a trader were objectively proven, was given the rather venerable task of training O'Connell. Spencer told Mendez that because he had done such an "excellent job" teaching Boydell, it was Mendez's job to train the "golden boy." Thereafter, Mendez was charged with running the Global Trading desk while teaching O'Connell the business from the ground up which he continued to do until the end of 2003.

22. The time and effort Mendez expended on O'Connell did not win him a place in Spencer's inner circle. After training O'Connell, Mendez learned from his conversations with

Boydell and O'Connell, that they were receiving "stepped up" bonuses of 80% of their base salaries, while Mendez's bonuses fell to half of that percentage. Upon information and belief, Spencer was simply redirecting Mendez's bonus money to Boydell and O'Connell.

23.    Moreover, Spencer, Boydell and O'Connell, functioned as a unit separate and apart from Mendez, failing to inform Mendez of critical decisions related to the volume of orders and equity trading in general, which made it difficult, if not impossible, for Mendez to do his job. Spencer also socialized extensively with Boydell and O'Connell outside of the workplace.

24.    Mendez repeatedly told Spencer that he was "not keeping [Mendez] in the loop" with regard to the orders and , instead leaving Mendez on the trading desk alone, while the others apparently worked on high profile trades that were handed to them by Spencer.

25.    The targeting of Mendez only intensified after that point. In mid-November of 2003, Mendez discovered that vile and degrading images of his face had been super-imposed onto various images found on the internet, and that those images were being sent to individuals both inside and outside the firm, as a means of harassing and humiliating Mendez into quitting.

26.    Mendez confronted Spencer after he saw O'Connell showing the images to least 4 individuals employed by Goldman Sachs, while Boydell admitted that he had "only" transmitted one such image to an individual employed by Cantor Fitzgerald; all in addition to the employees of Oppenheimer who Mendez knew had been copied on the images.

27.    Mendez went directly to the Internet Technology ("IT") department, whose employees admitted to Mendez that, at the direction of Spencer, they assisted in grafting Mendez's face to various internet images.

28.    Mendez threatened to go to HR, demanding that the IT department remove all

6

such images from the company's computers and that the dissemination of the images be blocked because the images obviously violated company policy and had been disseminated outside of the firm. The IT department, for its part, called Spencer and informed him that Mendez had been complaining about his team, but did nothing to pro-actively restrict the dissemination of such images.

29. Frustrated, Mendez approached one of the fund managers and told him "I just want it to stop." Rather than putting a stop to it, the manager also informed Spencer that Mendez was complaining.

30. On or about December 1, 2003, Spencer approached Mendez, and told him "sounds to me like you're not one of the boys."

31. Immediately thereafter, Mendez was thrown off of the Global Trading team, for unspecified "complaints" about his work. Bill Willby, who took over as Head of Global trading in January 2004, told Mendez that the decision to remove him was Spencer's alone, who, in Mr. Willby's words, still "held the reigns" on Global Trading.

32. Mendez immediately went to Oppenheimer's Human Resources division and met with a woman named Joan Brunell. Ms. Brunell refused to open a file based on Mendez's description of the discrimination and harassment that he had experienced, and even refused to investigate the vile and degrading internet images that had been sent outside the firm in direct violation of Oppenheimer's policies.[2]

---

[2] Those of us in the employment bar are all too familiar with the supposed "zero tolerance" stance that broker-dealers take with regard to the "inappropriate use of technology" by employees. Cases such as this one clearly illustrate that "zero tolerance" applies only to those pre-ordained for termination, such as Mr. Mendez, who, in the words of his manager, was not "one of the boys."

33. Mendez asked Ms. Brunell about putting him in a new position; a position, at the very least comparable to, the one he had previously held with Global Trading.

34. Brunell told that Mendez's previous position no longer existed, and that she and Spencer would find him a temporary placement until a permanent position could be found.

35. Despite Brunell's assertions that Mendez's position no longer existed, a new person was hired for Mendez's position on the Global Trading desk in or around May of 2004.

36. However, Spencer gave Mendez various temporary assignments as a "back up" in areas outside of his training or expertise, and was eventually placed as a "back up" with the Growth team in or around July of 2004.

37. In his capacity as a "back up," Mendez had no real trading authority. In fact, he was given a job that was not really a job at all – to set up "new screens"– but had no discernible trading responsibilities, despite his approximately 14 years of experience, objectively-proven track record and his advanced degree.

38. Mendez worked alongside of other "back ups" with no experience or training in the industry whatsoever.

39. Mendez complained to Human Resources repeatedly in the years 2005 and 2006 about his demotion, the discriminatory disparate treatment that was being visited upon him, as well as the fact that he no longer held a bona fide position with the firm. Human Resources did nothing, other than to tell Mendez that he was not qualified for any other position within the firm, including the position of analyst, for which he was preeminently qualified.

40. On or about February 15, 2007, Mendez was told that his employment with Oppenheimer was being terminated, ostensibly for unspecified complaints about his

performance, although he had no real duties that could have triggered such complaints as a so-called "back up."

### AS AND FOR A FIRST CAUSE OF ACTION
(National Origin/Race Discrimination In Violation of New York Executive Law §296 and New York City Administrative Code §§ 8-107 and 8-502)

41. Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "40" with the same force and effect as if fully set forth herein at length.

42. Plaintiff Mendez is an Hispanic who was marginalized, harassed, demoted, and, ultimately terminated as a direct and proximate result of his race/national origin. Additionally, he was stripped of any meaningful duties and subjected to contrived negative performance reviews, despite his excellent objective Plexus track record and impressive qualifications.

43. Plaintiff was compensated at a lower rate than other objectively less-qualified white, non-hispanic employees.

44. Plaintiff's national origin and/or race was an impermissible factor in the decision to harass, disparately pay, demote and terminate him.

45. Similarly situated non-Hispanic employees were not ostracized; and did not experience harassing treatment, demotion, disparate compensation or termination.

46. There was no legitimate, nondiscriminatory reason for Plaintiff to be harassed, excluded, demoted, re-ranked as a "back up," cheated out of his bonus and removed from his position.

47. There was no legitimate, nondiscriminatory reason for the Defendant to allow its agents to disseminate unabated, both inside and outside of the firm, vile and degrading images of

9

the Plaintiff on the internet.

48. New York Executive Law § 296 and New York Administrative Code §§ 8-107 and 8-502 prohibit discrimination on the basis of race and/or national origin.

49. As a direct result of these discriminatory acts in direct violation of New York Executive Law §296 and New York Administrative Code § 8-107, including, but not limited to, hostile work environment, demotion and termination, Plaintiff suffered injury and harm including, but not limited to, loss of past and future income, damage to his business reputation and marketability, and emotional injuries.

50. Further, Defendant's conduct was intentional, malicious, and contrary to public policy, and warrants an assessment of punitive damages.

WHEREFORE, Plaintiff respectfully demands judgment as against Defendant in an amount to be determined at trial, but in no event less than One Million Three Hundred Fifty Thousand Dollars ($1,350,000.00) in compensatory damages; punitive damages in an amount to be determined at trial, but in no event less than Three Million Dollars ($3,000,000); the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

AS AND FOR A SECOND CAUSE OF ACTION
(Retaliation In Violation of New York Executive Law § 296 and
New York City Administrative Code §§ 8-107 and 8-502)

51. Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "50" with the same force and effect as if fully set forth herein at length.

52. Plaintiff complained to both the IT department, a Fund Manager, and Human Resources about the discrimination and harassment he had experienced asking that, at the very

least, degrading images of Mendez should not be allowed to circulate via company computers, and that he be returned to his position.

53. Immediately following his complaints, Mendez was stripped of his duties as a trader, demoted to the position of "back up," told he was "not one of the boys," and, ultimately, terminated, because he was allegedly not "one of the boys" and not performing well as a "back up."

54. New York Executive Law § 296 and New York City Administrative Code §§ 8-107 and 8-502 prohibit acts of retaliation in response to an employee's filing or communication of a complaint or charge of improper discriminatory treatment as Plaintiff did herein.

55. As a direct result of defendant's violations of New York Executive Law §296 and New York Administrative Code §§ 8-107 and 8-502, Plaintiff has suffered damages, including but not limited to, loss of past and future income, damage to his business reputation and marketability, and emotional injuries.

56. Further, Defendant's conduct was intentional, malicious, and contrary to public policy, and warrants an assessment of punitive damages.

WHEREFORE, plaintiff respectfully demands judgment as against Defendant in an amount to be determined at trial, but in no event less than One Million Three Hundred Fifty Thousand Dollars ($1,350,000.00) in compensatory damages; punitive damages in an amount to be determined at trial, but in no event less than Three Million Dollars ($3,000,000); the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

57. Plaintiff hereby demands a jury trial of the facts and circumstances alleged herein.

Dated: New York, New York
       June 26, 2007

                                                Neal Brickman (NB 0874)
                                                The Law Offices of Neal Brickman, P.C.
                                                *Attorneys for Plaintiff Jesus Mendez*
                                                317 Madison Avenue - 21st Floor
                                                New York, New York 10017
                                                (212) 986-6840
                                                (212) 986-7691 (fax)